Eric L. Troff, Esq., CSB #110031
BAER & TROFF, LLP
35 N. Lake Avenue, Ste. 670
Pasadena, CA 91101
(310) 802-4202 telephone
(626) 568-2800 facsimile

Attorneys for Defendants and
Cross-Complainants
InstaCare Corp. and
PharmaTech Solutions, Inc.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GOTHAM INSURANCE COMPANY, | Case No.: 5:13-CV-03810-BLF |
| Plaintiff in Interpleader, | [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW |
| vs. | HON. BETH LABSON FREEMAN |
| SHASTA TECHNOLOGIES, LLC, INSTACARE CORP. and PHARMATECH SOLUTIONS, INC. | Trial Dates:   September 7 and 12, 2016<br>Courtroom:   3, 5th FL |
| Defendants in Interpleader. | |
| AND RELATED COUNTER-CLAIM. | |

A bench trial of the captioned matter was held on September 7 and 12, 2016 in Courtroom 3, 5th FL of the above entitled Courthouse, the Honorable Beth Labson Freeman, Judge Presiding. Eric Troff, Esq., of Baer & Troff LLP, appeared on behalf of Defendants in Interpleader and Cross-Complainants Decision Diagnostics, Corporation, fka InstaCare Corp., and PharmaTech Solutions, Inc. David C. Fortney, Esq., of Ogloza Fortney LLP, appeared on behalf of Defendant in Interpleader Shasta Technologies,

LLC, and Cross-Defendants Shasta Technologies, Inc., Calvin A. Knickerbocker, Jr. and Calvin A. Knickerbocker, III.

Pursuant to the parties' Joint Pretrial Conference Statement, this Court's July 29, 2016 Order thereon, the Stipulations of the parties, and the evidence and testimony introduced at trial, the Court makes the following Findings of Fact and Conclusions of Law.

## I.    FINDINGS OF FACT

In their Joint Pretrial Conference Statement the Parties stipulated to the following facts:

### The Parties

1.    Gotham Insurance Company is a New York Corporation, with its principal place of business located at 919 Third Ave., New York, New York.

2.    Gotham does business in this Judicial District.

3.    Shasta Technologies, LLC is an Oregon limited liability company with its principal place of business located at 7340 Hunzkier Road, Ste. 205, Tigard, Oregon.

4.    Defendant Calvin A. Knickerbocker, III is the Managing Member of Shasta Technologies, LLC.

5.    Defendant Calvin Knickerbocker, Jr. is the father of Calvin A. Knickerbocker, III, and a principal in Shasta Technologies, LLC.

6.    Defendant Decision Diagnostics, Inc. is a Nevada corporation with its principal place of business located at 2660 Townsgate Road, Ste. 300, Westlake, California.

7.    Decision Diagnostics is the parent corporation of Defendant PharmaTech Solutions, Inc.

8.    Decision Diagnostics was formerly known as InstaCare Corp.

*[PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW*

9. Defendant PharmaTech Solutions, Inc. is a Nevada corporation with its principal place of business located at 2660 Townsgate Road, Ste. 300, Westlake, California.

## The Gotham Policy

10. Gotham issued Policy No. IP00705 to Shasta entitled Intellectual Property Infringement Defense Cost Reimbursement Insurance effective May 20, 2010 to May 20, 2011. (Hereafter the "Policy.")

11. The Policy provides coverage limits of $2 million for litigation expenses and damages per claim, and $2 million for litigation expenses and damages in the aggregate.

12. The Policy is subject to a $250,000.00 self-insured retention, with a 10% co-pay.

13. At the request of Shasta, Gotham issued an Endorsement, No. IPI-DEF 843-10B to the Policy adding PharmaTech and InstaCare Corp. as additional insureds.

14. The Policy is governed by New York law.

## The GenStrip

15. In 2011, Shasta was the owner of a product known as the GenStrip, which is a diagnostic test strip to be used in conjunction with diagnostic test meters to measure a person's blood sugar at any particular point in time.

16. Conductive Technologies, Inc. (hereafter "CTI") is a contract manufacturer for the GenStrip.

## The Exclusive Distributorship Agreement

17. On or about June 20, 2011, PharmaTech entered into an Exclusive Distributorship Agreement with Shasta to distribute the GenStrip.

## The Underlying Action

18. On September 9, 2011, LifeScan Scotland, Ltd. filed a lawsuit for patent infringement against Shasta, PharmaTech, InstaCare and CTI entitled *LifeScan Scotland, Ltd. v. Shasta Technologies, LLC, et. al.*, in the United States District Court for Northern California, San Francisco Division, Case No. CV11-04494. (Hereafter the "Patent Litigation.")

19. In the Patent Litigation LifeScan alleged that the GenStrip, owned at that time by Shasta, distributed by PharmaTech, and manufactured by CTI, infringed its patents for a similar diabetic test strip.

20. Gotham defended both Shasta and PharmaTech in the Patent Action pursuant to the Policy.

21. During the course of the Patent Litigation disputes arose between Gotham, Shasta and PharmaTech over Gotham's non-payment of defense costs, and also whether PharmaTech was entitled to separate defense counsel.

22. When these disputes could not be settled, Gotham filed a first Interpleader Action against Shasta and PharmaTech on June 1, 2012, in the United States District Court, Northern District of California, San Jose Division, entitled *Gotham Insurance Company v. Shasta Technologies, LLC, et. al.*, Case No. CV12-02823.

23. After this first Interpleader Action was filed, additional disputes arose between the parties.

24. In the Parties' Joint Case Management Statement Shasta took the position that it was entitled to 100% of the Policy defense reimbursements.

25. Intellectual Property Services Corporation (hereafter "IPSC") was the claims representative for Gotham with respect to Shasta's and PharmaTech's claims under the Policy.

26. Shasta was also defending CTI in the Patent Action.

27. CTI is not a named or additional insured under the Policy.

28. As such, Gotham took the position that it would only reimburse Shasta's legal fees for its defense at a 50% rate.

## The Stipulation and Court's Order to Admit the Declaration of Robert Andris

29. During 2012, Robert Andris was a partner with Ropers, Majeski, Kahn & Bentley LLP located at 1001 Marshal Street, Ste. 500, Redwood City, California. (Hereafter "Ropers.")

30. Robert Andris was one of the Ropers attorneys defending Shasta and CTI against the patent infringement claims of LifeScan Scotland, Ltd. in the Patent Litigation.

31. As part of Mr. Andris' duties he communicated with Sandra Walker, who he understood was a claims representative with IPSC.

32. Robert Andris' communications with Ms. Walker related to the reimbursement of Ropers' fees and costs in the Patent Litigation.

33. Exhibit A, attached to Mr. Andris' Declaration is a true and accurate copy of an email that he received from Sandra Walker dated June 14, 2012. (Ex. 5, and sub exhibit A, attached thereto.)

34. Exhibit B, attached to Mr. Andris' Declaration is a true and accurate copy of an email that he sent to Sandra Walker on July 19, 2012, as well as an email that Mr. Andris received from Sandra Walker dated July 25, 2012. (Ex. 5, and sub exhibit B, attached thereto.)

*[PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW*

35. Both of these emails make plain that Gotham was intending to pay Ropers' defense fees at a rate of 50%.

## The Gotham I Settlement

36. The parties settled the first Interpleader Action with that Settlement and Joint Defense Agreement effectively signed as of August 23, 2012. (Hereafter the "Gotham I Settlement.")

37. Under the Gotham I Settlement the parties agreed that: (i) Shasta and PharmaTech would each have separate counsel; (ii) PharmaTech's counsel, Lathrop & Gage, would be the lead counsel on behalf of PharmaTech and Shasta; (iii) Shasta and PharmaTech would each be responsible for paying $125,000.00 of the $250,000.00 self-insured retention; (iv) Shasta and PharmaTech would each submit the invoices from their counsel for professional services and costs incurred in the Patent Action above $125,000.00 to Gotham for payment; and (v) no party would act inconsistently with the terms of the Joint Defense Agreement.

38. After the Gotham I Settlement, Gotham continued to pay Ropers' defense fees and costs incurred in the Patent Litigation at a rate of 50%.

39. Shortly after the Gotham I Settlement was reached, Shasta began to contest Gotham's payment of Ropers' invoices at the rate of 50%.

40. Shortly after the Gotham I Settlement was signed, Shasta also demanded that all reimbursement payments be paid to it alone.

## The Instant Interpleader Action

41. When further disputes arose amongst the parties concerning their respective rights to the Policy proceeds and benefits, Gotham instituted the present Interpleader Action.

*[PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW*

42. Gotham has interpleaded the remaining Policy benefits of $578,733.58 with this Court.

43. Gotham has disclaimed any interest in the remaining Policy benefits, and has waived any right to recover attorneys' fees and costs.

44. Pursuant to the Stipulation of the parties, and this Court's Oder dated February 4, 2015, Gotham has been dismissed from the instant Interpleader Action.

The Term Sheet

45. The parties signed a Term Sheet on May 20, 2014.

46. The Term Sheet contained a provision that $478,000.00 of the Interpleaded Funds was to be distributed to pay Shasta/Ropers for the defense fees incurred by Ropers in defending Shasta in the Patent Litigation.

PharmaTech Successfully Defends One of LifeScan's Patents

47. On August 6, 2014, PharmaTech successfully defended LifeScan's claim that the GenStrip infringed on its patent no. 105 before the Patent Trial and Appeal Board. (Hereafter the "Board.")

48. LifeScan appealed the Board's written Decision to the United States Court of Appeals for the Federal Circuit on October 2, 2016.

49. On January 1, 2016, the United States Court of Appeals for the Federal Circuit affirmed the Board's Decision  entered Judgment in PharmaTech's favor on the 105 patent.

The Consent Judgments and Shasta's Settlement with LifeScan

50. On February 13, 2015 Shasta's principal, Calvin Knickerbocker, Jr. testified in his deposition taken in the Interpleader Action that Shasta's GenStrip did not infringe any of LifeScan's patents.

*[PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW*

51. On or about February 27, 2016, LifeScan settled its patent infringement claims against Shasta.

52. As part of this Settlement Shasta agreed that a Consent Judgment could be entered against it in the Patent Litigation under which Shasta admitted that claims 1, 2, 24 and 25 of LifeScan's U.S. Patent No. 5,708,247 and claims 1, 2, 11, 22, and 23 of LifeScan's U.S. Patent No. 6,241,862 were not invalid, and were infringed by the manufacture, use, sale, and offer for the sale of the GenStrip product.

53. Paragraph 12.4 of the LifeScan Settlement (*infra*) specifically excludes from the "no admission of any liability" language Shasta's re-affirmance that it has infringed LifeScan's patents with respect to the GenStrip.

54. Under the terms of the LifeScan Settlement LifeScan also agreed to pay Shasta $100,000.00, minus a $2,000.00 royalty payment owed by Shasta to LifeScan.

55. LifeScan also granted Shasta an non-exclusive license to manufacture, sell and distribute the GenStrip to anyone except PharmaTech.

56. Nevertheless, LifeScan agreed that Shasta could sell the GenStrip to PharmaTech so long it had LifeScan's approval.

## LifeScan Settles its Patent Infringement Claims Against PharmaTech

57. On or about May 6, 2016, LifeScan settled its claims of patent infringement against PharmaTech.

58. The terms of this settlement are confidential.

In addition to the above, the Court finds the following facts that were disputed at the time of trial:

1. There was not adequate consideration to support that provision of the parties' Binding Term Sheet that releases $478,000.00 of Interpleader Funds to Shasta/Ropers.

*[PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW*

2. It would be unfair and inequitable for Shasta/Ropers to receive $478,000.00 from the Interpleader Funds in defending against claims of patent infringement when Shasta has now admitted the very patent infringement that it was defending against.

3. Ropers' claimed fees of $478,000.00 of the Interpleader funds incurred in defense of the Patent Litigation were, in large part, excessive, duplicative and unnecessary.

4. Ropers has been sufficiently paid to date such that PharmaTech is entitled to $_____ of the remaining Interpleader Funds.

5. When Shasta signed the Gotham I Settlement, though the actions of Calvin A. Knickerbocker, Jr. and Calvin A. Knickerbocker III, the reasonable inference was that Shasta had no intention of performing the same.

6. The Gotham I Settlement resolved the parties' dispute over a 50% reduction to Ropers' bills.

7. Shasta breached the Gotham I Settlement by re asserting claims for Policy benefits that had been released, and by demanding that all of the remaining Policy benefits be paid to it.

8. PharmaTech is entitled to damages in the amount of $_____ for Shasta's breach of the Gotham I Settlement.

9. PharmaTech did not breach the Gotham I Settlement.

10. PharmaTech's expert, Andre Jardini, Esq., is qualified to be a expert on the subjects of his report, i.e., that Ropers' billings in the Patent Litigation were excessive, duplicative, and unnecessary, and that Ropers had been paid more than enough for its secondary role in the Patent Litigation such that it was not entitled to any more money from the Interpleader Funds.

//
//

*[PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW*

## CONCLUSIONS OF LAW

"It is generally recognized that interpleader 'developed in equity and is governed by equitable principles.' " (See *Aetna Life Ins. Co. v. Bayona* (9th Cir. 2000) 223 F.3d 1030, 1033-1034.) "The term 'equitable' has been defined as meaning 'according to natural right or natural justice; marked by due consideration for what is fair, unbiased, or impartial; fair; just." (See *U.S. v. 11,360 Acres of Land in Yuba County, Cal.* (1945 N.D. CA) 62 F.Supp. 968, 970.)

In conformity with the equitable nature of interpleader, Defendants PharmaTech Solutions, Inc. and InstaCare Corp. (hereafter collectively referred to as "PharmaTech") have also raised the provisions of <u>Civil Code</u> Section 3391 as an affirmative defense to Shasta's claim that it is entitled to $478,000.00 of the Interpleader Funds as payment for Ropers' fees incurred in defending Shasta in the Patent Litigation. This statute supports the denial of specific enforcement where it would not be "fair, just, and unreasonable."[1]

In the present case, PharmaTech's expert, Andre Jardini, made an exhaustive review of Ropers' billings in the Patent Litigation, as compared with the billings of Lathrop & Gage, who the parties agreed under the Gotham I Settlement would be the "lead counsel" in the Patent Litigation. Based on this review Mr. Jardini has concluded that Ropers' billings were: (i) excessive; (ii) duplicative, and (iii) unnecessary as Lathrop & Gage were acting as the lead defense counsel.

Furthermore, based on the amounts that have already been paid by Gotham for Ropers' work, versus the amounts Gotham has paid for Lathrop & Gage's work, counsel, the Court accepts Mr. Jardini's opinion that Ropers has more than been compensated, and that if Ropers were to be given an additional $478,000.00, it will have

---

[1] <u>Civil Code</u> Section 3391 states, in relevant part:
> "Specific performance cannot be enforced against a party to a contract in any of the following cases:
> 2. If it is not, as to him, just and reasonable...."

1  been overpaid for its alleged work on the Patent Litigation to the detriment of

2  PharmaTech and lead counsel Lathrop & Gage.

3  Shasta's argument that the Court is in a better position to assess the

4  reasonableness of Ropers' billings is unavailing and unrealistic. This Court cannot in a

5  short, two-day trial, perform a review and analysis of hundreds of invoices from three

6  different firms over a two-year period, which is precisely why Mr. Jardini's exhaustive

7  review and analysis was helpful to this Court.

8  For the reasons stated above, it is the Court's conclusion that $_____, of

9  remaining the Interpleader Funds should be paid to PharmaTech.

10

## PHARMATECH'S CROSS-COMPLAINT

12  PharmaTech's First Cause of Action was for breach of the Gotham I Settlement.

13  Under the Gotham I Settlement, the parties agreed that PharmaTech would have

14  separate counsel, Lathrop & Gage, and that Lathrop & Gage would be "lead counsel" in

15  the Patent Litigation while Shasta continued to be defended by Ropers. Each party was

16  to share the self-insured retention of $250,000.00, i.e., $125,000.00, each, and thereafter

17  were to submit their separate defense invoices for payment.

18  Prior to the execution of the Gotham I Settlement, however, Shasta was well

19  aware of what Gotham's position on the payment of defense fees would be, as

20  Gotham's claims handler, IPSC, sent a spread sheet to Ropers on June 14, 2012

21  showing that reimbursements to Ropers would be at the 50% rate, and thereafter sent

22  another email to Ropers on June 25, 2012 explaining that the 50% rate was a proration

23  of the defense fees based on Ropers' representation of Shasta, as a named insured, and

24  CIT, as a non insured. (See Decl. of Robert Andris, and Exhibits A and B, attached

25  thereto, already on file with this Court [Docket No. 94].)

26  Indeed, in answering paragraph 41 of Gotham's First Amended Complaint in

27  Interpleader, Shasta admitted that "at times Gotham informed them of Gotham's

28

interpretation of certain provisions of the Policy, including on the dates alleged" (i.e., June 14 and 25, 2013). (Ex. 18.)

Nevertheless, in signing the Gotham I Settlement, while Shasta and PharmaTech did not release any claims they had against each other (*id.* at p. 5, ¶ 6), Shasta dismissed any claims that it had against Gotham, *with prejudice*, and waived the protections of California Civil Code Section 1542, thus releasing any and all claims that existed at the time, whether known or unknown.

Because Shasta had taken the position in the first Interpleader Action that it was entitled to 100% of the defense fees, and because Shasta knew that Gotham intended to pay only 50% of Ropers' invoices, which position Shasta contends it objected to "at all times," any claim from Shasta that Gotham had no right under the Policy to pay only 50% of Ropers' invoices is a claim that existed at the time of the Gotham I Settlement. Consequently, any such claim has been released.

By continuing to assert a claim for more than 50% of Ropers' defense fees after the Gotham I Settlement was signed, and by also demanding from Gotham that all of the remaining Policy limits be paid to it, Shasta breached the Gotham I Settlement. The evidence at trial (Belcher testimony and Osborne emails and Declaration, as well as Calvin A. Knickerbocker, Jr.'s admissions of the Osborne facts) also established that Shasta's breach of the Gotham I Settlement was the proximate cause of Gotham's filing of the instant Interpleader Action, which PharmaTech was forced to defend, at least until the parties signed the Binding Term Sheet on March 20, 2014, which was an attempt to resolve the disbursement of the Interpleader Funds.

As the Gotham I Settlement specifically provided for the recovery of damages arising from any breach (Ex. 4, § 9. (G).), PharmaTech is entitled to damages for its attorneys' fees incurred in defending against the Interpleader Action from the date of the Gotham I Settlement, i.e., August 23, 2012, to the date of the Binding Term Sheet, March 20, 2014, in the amount of $_____. These are not the recovery of

attorneys' fees *qua* attorneys' fees, but represent damages proximately incurred. (See *Microsoft Corp. v. Motorola, Inc.* (2015 9th Cir.) 795 F.3d 1024, 1049.)

PharmaTech's Second Cause of Action is for Promise Made with No Intention of Performing, to wit, that Shasta, through the acts of its principals, Calvin A. Knickerbocker, Jr., and his son, Calvin Knickerbocker, III, had no intention of performing or abiding by the payment of defense fees when Shasta signed the Gotham I Settlement. The elements of a cause of action for false promise are: (1) a promise by the defendant (2) made without an intent to perform and (3) made with the intent to induce reliance by the plaintiff, followed by (4) reasonable reliance by the plaintiff that results in (5) injury to the plaintiff. (Civ.Code, §§ 1572, 1710; *Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638.) "The intention not to perform a promise is a matter of inference from the facts proven and subsequent conduct may be sufficient to show such intention." (See *Longway v. Newbery* (1939) 13 Cal.2d 603, 611.)

Here, there are many factors from which a reasonable inference can be drawn that Shasta had no intention of performing the Gotham I Settlement at the time it was signed.

First, there is the confusing nature in which Shasta signed the Gotham I Settlement. Shasta's principal, Calvin Knickerbocker, Jr. was initially unsure whose signature was on the Gotham I Settlement, later testifying that he gave signatory authority to his son, Calvin Knickerbocker, III, to sign as "Calvin A. Knickerbocker, Jr.," while admitting that Calvin Knickerbocker, III also sometimes goes by the name Calvin Knickerbocker, Jr. This obfuscated state of affairs indicates less than a forthright desire to be bound by the Gotham I Settlement terms.

Secondly, although the Gotham I Settlement was expressly intended to be a resolution of the Interpleader disputes, and although the Gotham I Settlement specifically states that it is intended to be a "final expression of their [the parties'] agreement," Calvin A. Knickerbocker, Jr., later stated in a Declaration previously filed

in this case, that the Gotham I Settlement was only an "interim" agreement. (Ex. 16.) This is inconsistent with an intent to be bound by the Gotham I Settlement.

Third, although Shasta knew prior to signing the Gotham I Settlement that Gotham intended to pay only 50% of Ropers' defense bills (Ex. 5, and sub exhibits A, and B, attached thereto), Shasta made no attempt to address or resolve this issue with any degree of specificity, agreeing only that all parties would abide by the Policy in seeking the payment of defense fees. This, of course, "left the door open" for Shasta to claim further Policy breaches when Gotham acted in accordance with its expressed intent to pay only 50% of Ropers' defense fees.

Fourth, Shasta then began to claim that Gotham had breached the Gotham I Settlement by demanding more than a 50% payment of Ropers' defense fees, and by also demanding that all defense payments should be made to it. This was inconsistent with the Gotham I Settlement, in which the parties agreed that they would perform the "in good faith" and would take no actions thereunder that would be "inconsistent" with the same.

Fifth, Shasta then brought a Cross-Complaint against Gotham alleging both a breach of the Policy and seeking punitive damages on its separate cause of action for "bad faith." Shasta then dismissed this Cross-Complaint after realizing that New York law governed the Policy, and that New York law did not permit a cause of action for bad faith and punitive damages. (Exs. 18 and 23.)

From all of the above a reasonable inference can be drawn that Shasta, through the acts of Calvin A. Knickerbocker, Jr., and Calvin A. Knickerbocker, III, had no intention of performing the Gotham I Settlement at the time it was signed, but, rather, acted in a manner that was so inconsistent with this Agreement as to support PharmaTech's allegations that Shasta a planned to "set Gotham up" for what it hoped would be a lucrative punitive damages case.

*[PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW*

As a result of this tort of false promise, PharmaTech was forced to defend itself against the instant Interpleader Action, which Gotham brought after Shasta refused to abide by the terms of the Gotham I Settlement. This situation qualifies for application of the tort of another doctrine, in which a party may recover as damages, its attorneys' fees necessarily incurred because of the tort of another. (See *Prentice v. North Am. Title Guaranty Corp.* (1963) 59 Cal.2d 618, 620.)

Based on the above, the Court concludes that Shasta, through the acts of Calvin a. Knickerbocker, Jr. and Calvin A. Knickerbocker, III, had no intention of performing the Gotham I Settlement at the time it was signed. Accordingly, PharmaTech may recover against Shasta, Calvin A. Knickerbocker, Jr. and Calvin A. Knickerbocker, III, jointly and severally, its attorneys' fees incurred in defending against the Interpleader Action from the date of the Gotham I Settlement, i.e., August 23, 2012, to the date of the Binding Term Sheet, March 20, 2014, in the amount of $_____.

The Court also finds that punitive damages against Shasta, Calvin A. Knickerbocker, Jr. and Calvin A. Knickerbocker, III, jointly and severally, are appropriate in the amount of $_____.

**IT IS SO ORDERED**

DATED:_____, 2016          _____
                                    JUDGE OF THE UNITED STATES
                                    DISTRICT COURT

*[PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW*